

**FILED**

Mar 25 2015, 9:22 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Chelsea Taylor,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 25, 2015

Court of Appeals Case No.
49A02-1402-CR-90

Appeal from the Marion Superior
Court
The Honorable Lisa Borges, Judge
Cause No. 49G04-1204-FA-022784

**Bailey, Judge.**

# Case Summary

[1] Chelsea Taylor ("Taylor") appeals her conviction for Neglect of a Dependent, as a Class A felony.[1] Taylor presents three issues for review, one of which is a challenge to the sufficiency of the evidence. Concluding that the State did not present sufficient evidence of probative value, we reverse.

# Facts and Procedural History

[2] On January 17, 2012, at around 4:30 p.m., Taylor reported to work a shift at an Indianapolis restaurant. Taylor's live-in boyfriend, Ryan Worline ("Worline"), was left home in charge of Taylor's one-year-old son, J.N., and Worline's toddler, A.W. Over the course of several hours, neighbors in the apartment building heard repetitive thumping noises, suggestive of something being dropped to the floor. Neighbor Emily Jackson went upstairs to investigate but no one responded to her knocking. The noises had ceased by the time she went to bed around 10:00 or 10:30 p.m.

[3] Taylor arrived home from work around 10:00 p.m. Reportedly, she found A.W. asleep in bed with Worline, then moved A.W. to her own bed and checked on J.N. Taylor went to sleep on the sofa.[2] When she awakened the

---

[1] Ind. Code § 35-46-1-4. Effective July 1, 2014, this offense is now a Level 1 felony. We refer to the version of the statute in effect in 2012.

[2] She reported that she was upset with Worline due to his actions during a supervised visit earlier that day between J.N. and his father. Worline had called J.N.'s father a deadbeat.

next morning, she moved to the bedroom without checking on the children. Sometime during the morning, Taylor and Worline awoke and spoke briefly with a family member who had stopped at the apartment to retrieve something.

[4] Around noon, A.W. made sounds prompting Taylor to enter the children's bedroom. She found J.N. unresponsive. At approximately 12:06 p.m., a 9-1-1 dispatcher received a call reporting that J.N. was unresponsive. Emergency responders entered the apartment but did not attempt resuscitation efforts because they quickly concluded that J.N. was dead. A medical examination would later reveal that J.N. had died as a result of a skull fracture, and that he had likely died around midnight.

[5] The State charged Worline with Murder; both Worline and Taylor were charged with Neglect of a Dependent. The State further alleged that the neglect offense was elevated to a Class A felony because it "result[ed] in death." I.C. § 35-46-1-4(b)(3). Specifically, the State alleged that Taylor:

> Did … knowingly place [J.N.] in a situation that endangered the life or health of [J.N.], that is: failed to check on the welfare of [J.N.] and/or failed to obtain prompt medical attention for [J.N.] after [J.N.] had sustained multiple recent and acute blunt force traumatic injuries and, further, that said acts resulted in death to [J.N.][.]

(App. 106.)

Taylor was tried jointly with Worline. At the conclusion of the State's case-in-chief, Taylor moved for a directed verdict in her favor. Defense counsel argued that, although the State had presented evidence that Worline caused [J.N.]'s death by inflicting blunt force trauma, the State had not presented evidence that

Taylor knowingly withheld life-saving medical treatment. The State responded that it had presented "at the very least a scintilla of evidence" and argued that "the absence of actual knowledge is no defense" because a parent has a "duty to discover" and act in a reasonable manner. (Tr. 638-39.) The trial court denied the motion for a directed verdict, stating that the jury could consider evidence of bruising.

[6] With all charges submitted for the jury's consideration, discussions turned to instructions. Over Taylor's objection,[3] the jury was instructed as follows:

> Any parent, guardian or person having the care, custody or control of any child need not have specific intent to commit the crime of neglect of a child, but merely allowing an act inconsistent with the child's well-being to be committed will support a conviction for neglect of a child.

(App. 136.) The jury convicted Taylor of Neglect, as a Class A felony, and she received a sentence of thirty years. Twenty years were suspended, and Taylor was ordered to serve four years imprisonment, six years in community corrections, and five years on probation. Taylor now appeals.

# Discussion and Decision

---

[3] Defense counsel protested that the instruction (which referenced allowing an act) was not supported by the evidence. Indeed, Taylor was not alleged to have committed neglect by placing J.N. in Worline's care. Allegedly, she omitted necessary care. The State also alleged that Taylor failed to check on J.N., but essentially abandoned this allegation at the outset, claiming that Taylor did indeed check on J.N. and must have been able to perceive his need for medical treatment.

[7]  At the time of J.N.'s death, Indiana Code Section 35-46-1-4(a) provided in relevant part:

> A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
> (1) places the dependent in a situation that endangers the dependent's life or health:
> (2) abandons or cruelly confines the dependent;
> (3) deprives the dependent of necessary support; . . .
> commits neglect of a dependent, a Class D felony.

[8]  The offense was elevated to a Class A felony if it "result[ed]" in the death of a dependent less than fourteen years old. I.C. § 35-46-1-3(b)(3). In the context of neglect, "support" is defined to include "food, clothing, shelter, or medical care." I.C. § 35-46-1-1.

[9]  The State charged, consistent with Indiana Code Section 35-46-1-4(a)(1), that Taylor "knowingly place[d] [J.N.] in a situation that endangered the life or health of [J.N.]" but the alleged factual omission was that she "failed to check on the welfare of [J.N.] and/or failed to obtain prompt medical attention for [J.N.] after [J.N.] had sustained multiple recent and acute blunt force traumatic injuries." The allegation of failure to obtain medical care was premised upon subsection (a)(3). Finally, the State alleged, to support the elevation of the offense to a Class A felony, "that said acts resulted in death to [J.N.]." I.C. § 35-46-1-4; App. 106. In order to establish a "knowing" omission, the State was required to prove that Taylor acted with "aware[ness] of a high probability" that she was engaging in the proscribed conduct. I.C. § 35-41-2-2(b).

[10]    In our review of a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor reassess the credibility of witnesses. *Griesemer v. State*, __ N.E.3d ___ (Ind. Mar. 5, 2015), slip op. at 2. Instead, we look to the probative evidence supporting the verdict and the reasonable inferences drawn from that evidence. *Id.* If we find a reasonable trier of fact could infer guilt beyond a reasonable doubt, the conviction will be affirmed. *Id.*

[11]    Taylor's argument with regard to the insufficiency of the evidence is two-fold: first, according to Taylor, "there is no evidence that Taylor was actually and subjectively aware of a high probability that J.N. needed medical care." (Appellant's Br. at 19.) Second, according to Taylor, the State failed to show "a causal connection between the lack of medical care and J.N.'s death." (Appellant's Br. at 20.) She points to evidence that she was at work when the fatal injuries were inflicted and also to the coroner's testimony that the skull fracture was not detectable during an external examination.[4] As for causation, Taylor notes the absence of any testimony that the omission of medical care after 10:00 p.m. was a contributing factor to J.N.'s death around midnight. She contends that the jurors were asked to draw inferences supported only by other inferences in order to assess her presumed knowledge when she returned from work and checked on her child. Finally, she argues that the United States and Indiana Constitutions prohibit a conviction resting upon conjecture.

---

[4] The forensic pathologist, Dr. Ken Obenson, discovered the fatal skull fracture only after J.N.'s scalp was removed.

[12]	The State responds that evidence will not be reweighed on appeal, and argues that: "[t]he facts in this case support the inference that Taylor was aware of [J.N.]'s serious injuries." (Appellee's Br. at 14.) The State notes that J.N.'s injuries were numerous and severe and claims "any reasonable person would immediately know that J.N. needed help." (Appellee's Br. at 14.) As to causation, the State argues that it need not have shown that medical attention would have saved J.N. but rather, "Taylor was required to protect her son and not knowingly place him in a dangerously volatile situation that ultimately led to his murder." (Appellee's Br. at 16.)[5]

[13]	At the outset, we are compelled to acknowledge the pervasive confusion with regard to the allegations against Taylor. Although the State alleged that she knowingly "placed" J.N. in a dangerous situation, there are no corresponding factual allegations in the charging information. (App. 106.) The State did not allege that Taylor physically injured J.N.; nor is she alleged to have committed neglect by placing her child in Worline's care. The factual allegation against which Taylor was to defend herself was that she knowingly omitted medical care.

[14]	When the allegation of neglect is the failure to provide medical care, the State must show that the need for medical care was actual and apparent and the accused was actually and subjectively aware of that need. *Fout v. State*, 619

---

[5] We direct the State to the charging information, which did not allege that Taylor committed neglect by leaving J.N. in her boyfriend's care.

N.E.2d 311, 313 (Ind. Ct. App. 1993) ("[W]ithout some proof that Karrie subjectively knew of Lela's peril, the evidence was not sufficient to support the verdict.")  Here, the State presented no evidence that Taylor was informed of her son's dire condition.  Although some neighbors may have been concerned about strange noises, they did not contact Taylor.  Too, there is no evidence that Worline admitted his abuse of J.N.

[15] As such, the State focused upon Taylor's statements to investigators regarding her perceptions when she returned from work.[6]  Taylor's account of events was that she came home from work, moved Worline's sleeping child into a crib, and then checked on her sleeping son.  Taylor did not describe the lighting conditions, but reported being able to detect that J.N. was breathing and that he was in a diaper and was at least partially covered with a blanket.[7]  Neither

---

[6] Deputy Coroner Lloyd Sprowl succinctly denied having personal knowledge of "what Taylor saw when she checked on her child at 10:00." (Tr. 73.)  Likewise, Detective Robert Flack testified that he didn't know the lighting conditions and could not say whether injuries would have been visible to Taylor, as he was "not there at that time." (Tr. 542.)

[7] Taylor was interviewed by Detective Robert Flack.  During the interview, another officer wanted to "ask a couple [questions]" and was given permission to "jump in." (App. 244.)  Taylor was asked how J.N. was lying in the crib "when you found [J.N.]." (App. 244.)  The interviewer did not specify whether the time frame in question was upon Taylor's return from work or upon her finding J.N. deceased.  In any event, after several questions regarding crib placement and blankets, the following exchange took place:

Question:  How many blankets does he cover up with?

Taylor:  Uh, he usually just has one.  I put one in there with him.

Question:  Was it still on?

Taylor:  Yes, it's still on.  Then they had it over him.

Question:  When did you, I mean when you found him in bed?

Taylor:  Oh, yeah.

Question:  He still had the blanket on him?

Taylor's statements, nor any trial testimony, clarified what specific area of J.N.'s body was exposed.

[16] There is an absence of evidence that Taylor was aware of J.N.'s need for medical care and refused to summon help. Indeed, by the time of the closing argument, the State seemed to have supplemented its theory of prosecution. The prosecutor argued "he should have never been there alone with Ryan in the first place and Chelsea knew that." (Tr. 779.) The prosecutor urged the jury to convict Taylor because she failed to stop Worline:

> I know you'll come to the right decision. If Ryan Worline is guilty of murdering an infant child and leaving him to die and neglecting that child and Chelsea Taylor did nothing to stop him. They're guilty.

(Tr. 785.) Again, Taylor had not been charged with neglect for having left J.N. in Worline's care. Where the State charges a specific offense, the defendant cannot lawfully be convicted by proof that he or she committed a similar offense. *Kelley v. State*, 210 Ind. 380, 385, 3 N.E.2d 65, 68 (1936). The State's new theory by the end of the trial – that Taylor allowed Worline access to J.N. and simply "did nothing to stop [Worline]" is not the offense for which she was charged, and no conviction can be made to stand on that theory. (Tr. 785.)

---

Taylor: Uh, yeah, it was like down to his calves right here.

(App. 245-46.) There was no elaboration of whether "down to" his calves meant that J.N. was covered to that extent or rather that the blanket was pushed down to the calves, allowing significant exposure. In her follow-up statement, Taylor responded to a question specifically directed to "when you checked on him Tuesday night" by stating that J.N. was wearing just a diaper and was covered with a blanket. (App. 271.)

[17] As to the State's express allegation – that Taylor *knowingly* withheld medical care – the fact-finder could only reach that conclusion by means of pyramiding inferences to be drawn from Taylor's statements. An inference may be defined as: "A conclusion reached by considering other facts and deducing a logical consequence from them." Black's Law Dictionary, 897 (10th Ed.)

[18] In her statements, Taylor claimed she saw no injuries warranting medical intervention. The prosecution urged the jury to reject this claim of ignorance, but to use Taylor's account of checking on her child to reach conclusions such as "she saw the abrasion" and "she probably saw his frenulum." (Tr. 781.) However, the jury could reasonably infer that Taylor knowingly[8] deprived J.N. of medical care after her return home only *if* she saw and assessed injuries warranting medical attention, which could be true *if* injuries of such severity were visible to her, which could be true *if* conditions were visually suitable, that is, *if* J.N.'s body was exposed to the eye under adequate lighting conditions. What is lacking is an evidentiary fact having independent validity. *See Brown v. State*, 36 N.E.2d 759, 760 (Ind. 1941) ("A fact in the nature of an inference may itself be taken as the basis of a new inference, whether intermediate or final, *provided* the first inference have [sic] the required basis of a proved fact.") (emphasis added).

---

[8] The mens rea of "knowing" is applicable in this criminal matter, although the prosecution repeatedly urged the trial court and the jury to consider negligence concepts, such as "duty to discover" and "duty to act in a reasonable manner." (Tr. 639, 783.)

[19] In this instance, the jury simply was not provided evidence that Taylor inflicted an injury, was present when injury was inflicted, heard the infliction of injury, or saw manifestations of an injury necessitating medical care. Although Taylor conceivably or hypothetically could have seen an injury of such severity that immediate medical care would be warranted, there is no evidence that she did so.

[20] Although reasonable inferences may be drawn from evidence, it is the State's burden to present evidence on each element of the charged crime from which those inferences may be drawn. Ultimately, a criminal conviction absent proof beyond a reasonable doubt on each element of the charged crime amounts to fundamental error. *See In re Winship*, 397 U.S. 358, 361 (1970) (observing, "the requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation.")

[21] The inference-stacking without establishment of a predicate fact, which the prosecution invited and the State deems sufficient to withstand appeal, is not constitutionally adequate. The State failed to adduce sufficient proof to support Taylor's conviction for Neglect of a Dependent.[9]

---

[9] Because there is insufficient evidence to establish Taylor committed Neglect of a Dependent, it is not essential that we address the failure of proof necessary to elevate the charged offense to a Class A felony, that is, that an omission "resulted" in J.N.'s death. However, we observe that Dr. Ken Obenson, the witness whose testimony the State accepts as probative causation testimony, did not render an expert opinion regarding the critical time frame. He was never specifically asked whether the failure to obtain medical care after 10:00 p.m. when Taylor came home was a factor contributing to J.N.'s death (projected to be approximately two hours later).

Reversed.


Najam, J., and Pyle, J., concur.

---

Dr. Obenson's discussion of that which was, in his view, of "possible" benefit, (Tr. 264), is derived from a hypothetical propounded to him during cross-examination by Taylor's attorney. After Detective Bill Rogers testified that Taylor had reported hearing one of the two children in the home cry at 5:00 a.m., defense counsel directed Dr. Obenson's attention to the prospect of early morning medical intervention (apparently expecting to highlight the futility of medical care for a deceased child). Dr. Obenson replied in a manner unresponsive to the predicate facts of the hypothetical, which had incorporated a time frame after J.N.'s death:

> Defense Counsel: And if the child passed away in your opinion probably around midnight, would medical intervention at 5:00 o'clock in the morning, 6:00 o'clock in the morning, 7:00 o'clock in the morning, that would that make any difference.
>
> Dr. Obenson: It's hard to say. Head injuries – abuse – well, I shouldn't use the term, sorry, Your Honor. Inflicted head trauma has a very high mortality rate. And so intervention at 5:00, 6:00, 7:00, may not have been as helpful. But again, children are very resilient and it's also possible that if he had received medical attention at the time that you suggest that he could have recovered perhaps after a prolonged stay.
>
> Defense Counsel: So doctor, if I'm understanding you correctly, you just said that if a child died at midnight, five hours later medical intervention might have saved his life?
>
> Dr. Obenson: No. I'm saying that if he was alive within the range of death – the time of death were given or we're assuming is up to 12 hours. So if he was alive at the time that you suggest, even if the trauma was inflicted earlier, it is possible that if he was alive at the time that medical intervention would have been beneficial. Obviously, if he was dead, no medical intervention would help him.
>
> Defense Counsel: Can you say to a reasonable degree of medical certainty that this child was alive at 5:00 a.m. on January 18th?
>
> Dr. Obenson: I can say more likely than not, he was not.

(Tr. 263-65.)