

FILED

Jul 07 2017, 5:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander S. Kruse
Giddings Whitsitt Williams &
Nooning, P.C.
Lebanon, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Coltan A. Perryman,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 7, 2017

Court of Appeals Case No.
06A01-1605-CR-1049

Appeal from the Boone Superior
Court

The Honorable Matthew C.
Kincaid, Judge

Trial Court Cause No.
06D01-1510-F3-146

**Mathias, Judge.**

[1] Coltan A. Perryman ("Perryman") was convicted of Level 3 felony battery causing serious bodily injury to a child younger than fourteen and Level 6 felony neglect of a dependent after a jury trial in Boone Superior Court. Perryman was sentenced to an aggregate executed term of twenty-three years in the Department of Correction with an additional three years suspended. In this

appeal, Perryman challenges the admission of the child victim's videotaped statement under Indiana's protected-person statute, other evidentiary rulings, the sufficiency of the evidence, and the denial of his motion for mistrial.

[2] We affirm.

## Facts and Procedural Posture

[3] In September 2015, Perryman lived with his girlfriend Syreena Schooler ("Schooler") and A.G., Schooler's eight-year-old son by another man, in Lebanon, Indiana. They lived in the house of Leeann Barnes ("Barnes"), Schooler's mother, together with Barnes and the couple's three-year-old daughter R.P. Barnes worked days and Schooler worked nights, but Perryman was unemployed. The care of the children therefore often fell to him. Among other contributions, he would help A.G. with his homework and put him to bed at night.

[4] On the evening of September 30, 2015, Schooler was at work while the children were home with Barnes and Perryman. Around 7:00 p.m., Barnes, who is hard of hearing and uses hearing aids in both ears, woke up from an unaccustomed after-work nap in the downstairs living room and rushed to get supper ready by 7:30 p.m. Perryman and the children were upstairs. When supper was ready, Barnes called upstairs for Perryman and the children to come down and eat. R.P. came down, but A.G. and Perryman did not. Perryman called downstairs that he and A.G. were working on homework. This was unusual; Perryman did not always eat with the rest of the family, but A.G. always did.

[5] A.G. took medicine with his food every night and Barnes was anxious that he eat. After she and R.P. were finished eating, Barnes went upstairs to insist that A.G. eat as well. Perryman intercepted Barnes at the top of the stairs and waved her off. Behind him, Barnes could see A.G., his back to her, walking down the hall from Perryman's bedroom to his own. Barnes relented and went back downstairs. She played with R.P. outside until around 9:00 p.m., the children's bedtime. Unusually, A.G. again did not join them. When Barnes came back inside, she noticed the plate of food she had left out for A.G. was gone, presumably taken upstairs by Perryman. Barnes did not see Perryman or the children again before she went to bed between 10:00 p.m. and 11:00 p.m.

[6] Schooler got home from work around 1:30 a.m., October 1, 2015. She found Perryman and A.G. upstairs sitting on her and Perryman's bed. The left half of A.G.'s face was bloodied and bruised, and his right shoulder was bruised. Perryman was holding a washcloth to A.G.'s face. Frantic at the sight of her battered eight-year-old son, Schooler demanded to know what had happened. Perryman told A.G. to answer his mother. A.G., nearly unable to speak from his cut and swollen mouth, said that he had hit himself. Schooler rushed downstairs and woke Barnes, who had not seen A.G. since waking up from her after-work nap, except briefly from behind in the upstairs hallway, and did not know what had happened.

[7] Perryman told Schooler she was overreacting and should calm down. Schooler wanted to take A.G. to a hospital immediately. Perryman responded that injuries like A.G.'s look worse than they are, that the swelling would be much

better by morning, and that taking A.G. to a hospital risked having the Department of Child Services ("DCS") take A.G. away. Schooler, confused and exhausted, finally agreed not to take A.G. to a hospital that night. The three fell asleep in Schooler and Perryman's bed.

[8] In the light of the next morning, still October 1, 2015, it became clear that Perryman was wrong: A.G. looked worse. Other than to say he had hit himself, A.G. would give no explanation as to how or why he had been injured. Schooler decided she could no longer put off taking A.G. to the doctor. Perryman volunteered to come along. The three drove to a children's hospital in Indianapolis.

[9] At the hospital, the nurses and doctors examining A.G. did not believe his injuries were self-inflicted. The injuries were too severe; A.G.'s hands bore no trace of the force necessary to inflict them; A.G. was right-handed but the injuries were to the left side of his face; and A.G. had no history of the developmental or psychiatric disorders that could drive a child to such extreme self-harm. The doctors believed A.G.'s injuries were such that he suffered "significant" pain when they were inflicted. Tr. p. 415.

> [T]here was clearly blunt force trauma and . . . multiple blows.
> [A.G.] had marked swelling, disfiguring of his lips, specifically his lower lip. He had . . . a two centimeter laceration on his inner lip. . . . His lips were crusted and oozing. . . . [I]t was alarming. . . . [His lips] were painful to the touch. . . . [T]he whole left side of his face was bruised, above his eye, below his eye, his cheek, [and] his forehead. And then he had a bruise on his right upper arm.

Tr. p. 406.

[10] A social worker on staff at the hospital notified DCS that A.G. was a possible victim of child abuse. A DCS case worker was dispatched to the hospital, who in turn notified a detective of the Lebanon Police Department. The detective was a member of Boone County's "multi-disciplinary team," a group tasked with investigating child abuse and other crimes. Tr. p. 247. The DCS case worker and the detective headed to the hospital. Until then, Perryman had been in A.G.'s constant presence since the previous evening. Once informed of DCS's impending arrival, Perryman quickly departed.

[11] A.G. was subjected to numerous medical tests, including a CAT scan of his head, which showed no internal bleeding or other internal injury. Early the next morning, October 2, 2015, A.G. was discharged from the hospital in Schooler's custody, on the DCS-imposed condition that Perryman not be allowed back into Barnes's home.

[12] Later the same day, Schooler took A.G. to Boone County's Child Advocacy Center ("C.A.C."), where investigators are specially trained in the difficult, delicate task of interviewing child witnesses. Specifically, C.A.C. interviews are "open narrative interviews" designed "to [e]licit information from children . . . in a non-leading fashion" by asking "non-leading questions" in an environment that is "child friendly so that children aren't scared when they come in." Tr. p. 32. Boone County C.A.C. interviews are tape-recorded and observed by members of Boone County's "multi-disciplinary team." With great difficulty,

A.G. told his C.A.C. interviewer that it was Perryman who had hit him with a closed fist twenty minutes before supper on September 30, 2015, because Perryman was "mad." Ex. Vol., State's Ex. 1, 10:16:16 a.m.

[13] On October 2, 2015, the same day as A.G.'s C.A.C. interview, Perryman was charged by information in Boone Superior Court with Level 3 felony battery causing serious bodily injury to a child younger than fourteen and Level 6 felony neglect of a dependent. Perryman was further charged with being a habitual offender.

[14] On January 13, 2016, the State gave notice of its intent to offer the video recording of A.G.'s C.A.C. interview at trial under Indiana's "protected-person" statute. Ind. Code § 35-37-4-6. On February 24 and 29, 2016, the trial court held a hearing required by the statute to determine the interview's admissibility. A.G. testified and was cross-examined by defense counsel; Schooler, A.G.'s therapist, and the therapist's supervising psychiatrist testified as well. On March 1, 2016, the trial ruled A.G.'s C.A.C. interview admissible under the protected-person statute. On March 4, 2016, the trial court granted Perryman's motion to admit an audio recording of A.G.'s cross-examination on February 24, 2016.

[15] Perryman's case was tried to a Boone County jury over three days, from March 7, 2016, to March 9, 2016. On the first day of trial, the video of A.G.'s C.A.C. interview was played for the jury over Perryman's objections on statutory and

constitutional grounds. The jury then heard the audio of A.G.'s cross-examination on February 24, 2016.

[16] On March 8, 2016, the second day of trial, a nurse at the children's hospital testified over Perryman's objection to what the hospital's on-staff social worker told her on October 1, 2015, as follows: "I believe that [A.G.] told the social worker that [Perryman] had hit him with a closed fist." Tr. p. 393. The same day, a forensic biologist of the Indiana State Police Laboratory testified over objection to her serological analysis of some of the clothes A.G. and Perryman were wearing on September 30, 2015, as well as of the washcloth Perryman held to A.G.'s face. The trial court admitted over objection the biologist's report concluding that the items carried A.G.'s blood and Perryman's DNA. Finally, the same day, the State called a late-disclosed witness, one of Perryman's jailers at the Boone County jail, and offered a late-disclosed exhibit, Perryman's booking records at the jail. That evidence was admitted over objection and showed Perryman to be right-handed. During trial, however, Perryman had been observed taking notes with his left hand.

[17] At the end of the second day, the State rested, Perryman rested without presenting evidence, and the jury found Perryman guilty of battery and neglect as charged.

[18] On March 9, 2016, the third day of trial, the jury returned to try the habitual offender charge. Before the jury was seated, Perryman moved for a mistrial on the grounds that, earlier that morning, he had been put in sight of one to three

jurors while standing handcuffed in the breezeway of the courthouse. The trial court denied Perryman's motion after asking the jury "whether anything ha[d] happened since . . . yesterday . . . that cause[d] anybody any concern about whether they can be fair and impartial in this case[,]" and receiving no response. Tr. p. 533. The jury found Perryman to be a habitual offender.

[19] On April 26, 2016, Perryman was sentenced to a twenty-six-year term, twenty-three years executed in the Department of Correction and three years suspended to probation. The court imposed concurrent sentences of thirteen years on the Level 3 felony battery charge with three years suspended, and two years on the Level 6 felony neglect charge, fully executed. The court enhanced Perryman's sentence by thirteen years, fully executed, on the habitual-offender charge.

[20] Perryman now appeals, raising the following restated issues. As to A.G.'s C.A.C. interview, Perryman claims that it was inadmissible under the protected-person statute, and in the alternative that admission under the statute violates the confrontation clause of the Sixth Amendment to the federal constitution. As to the trial court's other evidentiary rulings, Perryman claims that the nurse's testimony on the social worker's statement was inadmissible hearsay; the forensic biologist's testimony and her report were inadmissible for failure to establish chain of custody; and the evidence presented by Perryman's jailer and booking records was inadmissible for late disclosure. Perryman claims further that the evidence supporting both convictions was insufficient, and

finally that being in view of one to three jurors while standing handcuffed in the breezeway of the courthouse entitled him to a mistrial.

## Discussion and Decision

### I.    Admission of A.G.'s C.A.C. Interview Was Not Error

[21]    Perryman challenges the admission of A.G.'s C.A.C. interview on statutory and constitutional grounds. The decision to admit evidence is within the trial court's sound discretion and is afforded "great deference" on appeal. *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind. 2003). The trial court abuses its discretion by ruling in a way clearly against the logic and effect of the facts and circumstances before it, or by misinterpreting the law. *Id.* at 703. Such broad discretion notwithstanding, because the protected-person statute "impinges upon the ordinary evidentiary regime . . . [,]" it imposes on the trial court "a special level of judicial responsibility." *Id.*

[22]    As relevant here, the protected-person statute protects victims of battery and neglect, I.C. §§ 35-37-4-6(a)(2), (5), who are younger than fourteen. *Id.* § (c)(1). The victim's otherwise inadmissible statement "concern[ing] . . . a material element of [the] offense," *id.* (d)(2), may be admitted for its truth against the accused if certain conditions are satisfied: if the trial court finds the child is unavailable to testify at trial because testifying would cause the child serious emotional distress such that the child cannot reasonably communicate, *id.* § (e)(2)(B)(i); if the trial court finds the child's statement sufficiently reliable after a hearing attended by the child, *id.* § (e)(1)(B); and if the child was available for

cross-examination at the hearing. *Id.* § (f)(1). Both parties agree that A.G.'s C.A.C. interview was otherwise inadmissible unless admissible under the statute.

*A.    Reliability of A.G.'s C.A.C. Interview Under the Protected-Person Statute*

[23]    Perryman challenges the trial court's determination that A.G.'s C.A.C. interview was reliable. As a predicate for admission under the protected-person statute, the trial court is required to find in a hearing attended by the child that "the time, content, and circumstances of the statement . . . provide sufficient indications of reliability." I.C. § 35-37-4-6(e)(1)(B). The hearing gives the trial court "the opportunity to consider the competency and credibility of the child[.]" *A.R.M. v. State*, 968 N.E.2d 820, 825 (Ind. Ct. App. 2012). This opportunity is critical because the trial court's findings here "act as the sole basis for finding the trustworthiness that permits introduction of otherwise inadmissible hearsay." *Pierce v. State*, 677 N.E.2d 39, 44 (Ind. 1997).

[24]    In evaluating the time, content, and circumstances of the statement for sufficient reliability, the trial court should consider

> whether there was significant opportunity for coaching, the nature of the questioning, whether there was a motive to fabricate, use of age[-]appropriate terminology, and spontaneity and repetition. Lengthy and stressful interviews or examinations preceding the statement . . . may cast doubt on [its] reliability . . . sufficient to preclude its admission. There are undoubtedly many other factors in individual cases.

*Id.* (citations omitted).

[25]    The trial court reported its findings on reliability as follows:

> A.G.'s videotaped interview . . . was conducted . . . within forty-eight hours of the injuries he sustained . . . .
>
> The [C.A.C.] interviewer . . . is a trained and certified forensic interviewer. . . .
>
> [The C.A.C. interviewer] built a rapport with A.G. by speaking to him in a friendly fashion and asking general questions at the start of the interview. . . .
>
> A.G. demonstrated excellent memory of events of his school day of September 30, 2015. In particular he remembered that he had been to the school library that day and checked out a book whose title he remembered. . . .
>
> A.G. demonstrated excellent memory of events at home the evening before the time he was injured. In particular, A.G. remembered that he had eaten spaghetti for dinner; that [R.P. and Barnes] had played outside; that his mother went to work after he had come home from school; and that the Defendant he names as Colt[a]n read the book [A.G] checked out to [A.G.] . . .
>
> [The C.A.C. interviewer's] questions were fair and not suggestive of answers. [The interviewer] repeated the answers A.G. gave back to him . . . to be sure that she had correctly understood what he was saying. . . . A.G. [had] the opportunity to make corrections and did make corrections as necessary. . . . The questions asked of A.G. . . . were open-ended and not leading. A.G. was not coached by the interviewer. There was only one interviewer in the room and A.G. was not pressured by multiple interrogators. The duration of the interview was not excessive.
>
> After demonstrating solid recall of details of the ordinary events of the day, A.G. stated at first that he could not remember how he was injured. . . .

> After [receiving] reassurances [from the interviewer] which were in no way suggestive of answers A.G. should give, A.G. reported that [Perryman] had struck him in the face with a closed fist and that it happened in [Perryman's] room. . . .

> After [an initial period of forgetfulness], A.G. returned to the manner of recounting events which was quite detailed in the degree of memory exhibited.

> The timing of the interview left little opportunity for A.G. to be manipulated. A.G. was not pressured into fabricating allegations. If anything, it appears the opposite may have been true.

> A.G.'s statements are reliable.

Appellant's App. p. 43.

[26] Our review of the record reveals the trial court's findings to be supported by the facts and circumstances before it. A.G. had an otherwise clear memory of the day of September 30, 2015, two days before his C.A.C. interview. After initial non-responsiveness, A.G. was able to state with the same clarity what had happened to him that evening: Perryman struck him with a closed fist twenty minutes before dinner. To the trial court's finding that there was little opportunity for manipulation or fabrication, we add that we discern no possible motive for manipulation or fabrication on the part of A.G., Schooler, Barnes, or any other actor in the case. We note further that, at the February 24, 2016, protected-person hearing, A.G. clearly demonstrated his ability to distinguish truth from falsehood. The trial court evaluated these facts under the proper standards set out by the statute and by case law. There was no abuse of discretion.

[27] Perryman's only argument to the contrary purports to detect three or four inconsistencies between A.G.'s C.A.C. interview, his testimony at the February 24, 2015, protected-person hearing, and other witness testimony at trial. However, any such inconsistencies are relatively minor (e.g., whether A.G. ate dinner with or without Barnes on September 30, 2015). Moreover, inconsistencies between A.G.'s C.A.C. interview and other witnesses' trial testimony cannot make out an abuse of the trial court's discretion because that testimony was not among the facts and circumstances before the trial court when it found A.G.'s C.A.C. interview reliable. Finally, it is "not surprising that a young child in an adversary courtroom setting may demonstrate a degree of confusion and inconsistency." *Hill v. State*, 646 N.E.2d 374, 378 (Ind. Ct. App. 1995) (review of sufficiency of evidence). Such inconsistency does not per se defeat a determination of credibility, *id.*, nor a determination of reliability, *M.T. v. State*, 787 N.E.2d 509, 512 (Ind. Ct. App. 2003), particularly when absent from the controlled, nonadversarial environment of the C.A.C. interview. We reject Perryman's contrary argument.

### B. Constitutionality of Admitting A.G.'s C.A.C. Interview Through the Protected-Person Statute Under the Sixth Amendment

[28] In the alternative, Perryman claims that admission of A.G.'s C.A.C. interview through the protected-person statute deprived him of his confrontation rights under the Sixth Amendment to the federal constitution.[1] Perryman argues that

---

[1] Perryman also cites our state constitution, which provides, "In all criminal prosecutions, the accused shall have the right . . . to meet the witnesses face to face[.]" Ind. Const., Art. I, § 13. In support, he cites one case

the protected-person statute is unconstitutional on its face by failing to require opportunity for cross-examination at the time the protected-person's statement is made, and by requiring trial judges to determine the reliability of the protected person's hearsay statement. Perryman argues further that the protected-person statute is unconstitutional as applied to him because it did not afford him opportunity for full, adequate, and effective cross-examination. In deciding challenges to the constitutionality of a statute, we begin from a presumption of constitutionality. *State v. Lombardo*, 738 N.E.2d 653, 655 (Ind. 2000). It is the challenger's burden to rebut this presumption. *Id.* All reasonable doubts are resolved in favor of constitutionality. *Id.*

[29] The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const., amend. VI. A witness is someone who "bear[s] testimony" against an accused. *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (quoting Webster's 1828 dictionary). "Testimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. Thus, for absent witnesses, the confrontation clause requires "unavailability and a prior opportunity for cross-examination." *Id.* at 68. By contrast, "when the declarant

---

of this court, incorrectly identified as a decision of our supreme court, discussing the Sixth Amendment. *Anderson v. State*, 833 N.E.2d 119, 126 (Ind. Ct. App. 2005). By his failure to provide independent authority and analysis, Perryman has waived his state constitutional claim. *Holloway v. State*, 69 N.E.3d 924, 931 (Ind. Ct. App. 2017).

appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Id.* at 59 n.9.

[30]  We assume without deciding that the statements at issue are testimonial. As relevant here, the protected-person statute both supplies grounds for unavailability, I.C. § 35-37-4-6(e)(2)(B)(i), and requires prior opportunity for cross-examination at a hearing. *Id.* § (f)(1). Perryman does not challenge the statutory mechanism for making a protected person unavailable. He challenges only the timing of the opportunity for cross-examination under the statute. The Sixth Amendment, Perryman argues, requires opportunity to cross-examine testimonial statements at the time they were made. This is incorrect for two reasons.

[31]  First, the protected-person statute cannot be unconstitutional on these grounds in cases of hearsay declarants who make testimonial statements before prosecution is commenced. Sixth Amendment rights are the rights of "the accused . . . ." Amend. VI. As such they do not attach prior to the formal institution of criminal proceedings — that is, before there is an accused. *See Texas v. Cobb*, 532 U.S. 162, 167–68 ("[The Sixth Amendment right to counsel] does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." (citation omitted)). Here, Perryman had no Sixth Amendment confrontation right at the time of A.G.'s C.A.C. interview because no prosecution had commenced, and Perryman was not an accused. Such will be the case for

many, if not most, protected persons, as well as many, if not most, police interrogations and other settings eliciting testimonial statements.

[32] Second, even if confrontation rights have attached at the time a testimonial statement is made, still the Sixth Amendment does not require opportunity to cross-examine at that time. *Crawford* requires "prior" opportunity for cross-examination of unavailable absent witnesses, not contemporaneous opportunity.[2] 541 U.S. at 68; *Howard v. State*, 853 N.E.2d 461, 470 (Ind. 2006) ("Only where a defendant has *never* had the opportunity to . . . cross-examine a witness does the admission of prior testimony at a subsequent proceeding violate the constitutional right of confrontation." (emphasis added)); *accord State v. Griffin*, 202 S.W.3d 670, 677 (Mo. Ct. App. 2006), *quoted in* Appellee's Br. at 21-22. It is uncontested that cross-examination at trial regarding a witness's hearsay statement satisfies the Sixth Amendment. *Crawford*, 541 U.S. at 59 n.9; *Mishler v. State*, 894 N.E.2d 1095, 1102 (Ind. Ct. App. 2008), *trans. denied*; *Agilera v. State*, 862 N.E.2d 298, 306 (Ind. Ct. App. 2007), *trans. denied*. We cannot perceive a reason why cross-examination either at the time the statement was given or at trial would satisfy the Sixth Amendment, but not cross-examination at any time in between. *See California v. Green*, 399 U.S. 149, 159 (1970) ("We cannot share the California Supreme Court's view that belated

---

[2] The testimonial hearsay at issue in *Crawford* was a statement given by Crawford's wife to police interrogators. 541 U.S. at 38-39. In discussing Crawford's lack of prior opportunity to cross-examine his wife, absent and unavailable under Washington's marital privilege, *id.* at 40, the Court never suggested that only Crawford's presence in the interrogation room would have satisfied the Sixth Amendment.

cross-examination can never serve as a constitutionally adequate substitute for cross-examination contemporaneous with the original statement.").

[33] Perryman's argument conflicts with the Supreme Court's post-*Crawford* cases as well, and most obviously, with its laboratory testing cases. *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). Applying Perryman's argument to those cases would require the accused's presence in the laboratory as the analyst prepared the testimonial report against him. But that is not the result reached there. *Bullcoming*, 564 U.S. at 652 ("The accused's right is to be confronted [at trial] with [the same analyst who prepared the report], unless that analyst is unavailable at trial, and the accused had an opportunity, *pretrial*, to cross-examine that particular scientist." (emphasis added)); *Melendez-Diaz*, 557 U.S. at 311 ("Absent a showing that the analysts were unavailable to testify at trial and that [the accused] had a *prior* opportunity to cross-examine them, [the accused] was entitled to 'be confronted with' the analysts at trial." (original emphasis omitted, emphasis added)).

[34] The protected-person statute does not offend the Sixth Amendment by failing to require opportunity for cross-examination at the time the protected person made a testimonial statement.

[35] Perryman's second challenge to the facial constitutionality of the protected-person statute fails as well. Perryman argues the statute runs afoul of *Crawford* by requiring trial judges to determine the reliability of the protected person's statement. Of course, *Crawford* did not fault reliability per se; it faulted

reliability in place of confrontation: "*Dispensing with confrontation* because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty." 541 U.S. at 62 (emphasis added). Here, the protected-person statute requires reliability in addition to confrontation; it does not permit the former to take the place of the latter. The confrontation clause does not require more.

[36] Finally, Perryman argues that the protected-person statute as applied to him unconstitutionally permitted admission of A.G.'s C.A.C. interview because A.G.'s alleged inability "to provide any coherent and meaningful testimony about the cause of his injuries[,]" Appellant's Br. at 22, at the February 24, 2016, protected-person hearing denied Perryman opportunity for full, adequate, and effective cross-examination.[3] *See Anderson v. State*, 833 N.E.2d 119, 126 (Ind. Ct. App. 2005); *Purvis v. State*, 829 N.E.2d 572, 581 (Ind. Ct. App. 2005). We disagree.

[37] The opportunity for cross-examination, and thus the confrontation clause, are "honored where the defense is given a full and fair opportunity to probe and expose testimonial infirmities such as forgetfulness, confusion, or evasion through cross-examination, thereby calling to the attention of the factfinder the

---

[3] In his reply brief, Perryman recasts this argument as another facial challenge to the statute: that the statutory basis for unavailability in this case, I.C. § 35-37-4-6(e)(2)(B)(i) (trial testimony would cause serious emotional distress preventing reasonable communication), by itself, precludes opportunity for full, adequate, and effective cross-examination. Because points raised for the first time in reply are waived, *Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011), we confine our review on this point to Perryman's opening brief.

reasons for giving scant weight to the witness['s] testimony." *Howard*, 853 N.E.2d at 470 (original alterations and quotations omitted) (quoting *Maryland v. Craig*, 497 U.S. 836, 847 (1990)). Whether the opportunity was full and fair is an inquiry into whether the state or the trial court impermissibly limited a defendant's cross-examination of the witnesses against him, not an inquiry into the mental faculties of those witnesses or the character of their testimony. *See Delaware v. Fensterer*, 474 U.S. 15, 19 (1985) ("It does not follow [from the requirement that a defendant be allowed the opportunity to impeach a witness on cross-examination] that the right to cross-examine is denied by the State whenever the witness['s] lapse of memory impedes one method of discrediting him.").

[38]   *Green* and *Fensterer* left as an open question "whether there are circumstances in which a witness['s] lapse of memory may so frustrate any opportunity for cross-examination that admission of the witness['s] direct testimony violates the Confrontation Clause." *Fensterer*, 474 U.S. at 20; *Green*, 399 U.S. at 168–69. That question was answered in the negative by *United States v. Owens*, 484 U.S. 554 (1988), in an opinion by Justice Scalia, the author of the *Crawford* opinion:

> The Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . It is sufficient that the defendant has the opportunity to bring out such matters as [the witness's bias, impairment,] and even (what is often a prime objective of cross-examination) *the very fact that he has a bad memory*. . . . The weapons available to impugn the witness['s] statement when memory loss is asserted will of course not always achieve

success, but successful cross-examination is not the constitutional guarantee.

*Id.* at 559-60 (original alterations, citations, emphasis, and quotations omitted; emphasis added). The conclusiveness of *Owens* on this point has been recognized by our supreme court. *Fowler v. State*, 829 N.E.2d 459, 466 (Ind. 2005) (holding defendant cannot claim denial of opportunity for cross-examination by recalcitrant trial witness's refusal to answer until defendant seeks to compel testimony).

[39] Two decisions of this court have found unconstitutional frustration of opportunity for cross-examination in the context of the protected-person statute, not in cases of lapsed memory or non-responsiveness, but where the trial court found the protected person unavailable under the statute because the protected person was "incapable of understanding the nature and obligation of an oath." I.C. § 35-37-4-6(e)(2)(B)(ii); *Anderson v. State*, 833 N.E.2d 119, 126 (Ind. Ct. App. 2005); *Purvis v. State*, 829 N.E.2d 572, 581 (Ind. Ct. App. 2005). Those cases are not in point because A.G. was not found incapable of understanding the nature of his oath. Indeed, A.G. affirmatively demonstrated his capacity to distinguish truth from falsehood and to appreciate the importance of that distinction. Tr. pp. 45-47.

[40] Here, Perryman's cross-examination of A.G. spans more than nine pages of the hearing transcript. Tr. pp. 47–57. A.G. answered questions about the course of events leading up to his battery, and about his hospital visit and C.A.C. interview afterwards. Defense counsel was able to fully probe whether motive

or opportunity for manipulation or fabrication existed. Any lapses in A.G.'s memory went to A.G.'s credibility and were within the province of the jury to evaluate. Perryman was not denied the opportunity for cross-examination guaranteed to him by the Sixth Amendment.

## II. Other Evidentiary Rulings

[41] We review Perryman's remaining challenges to evidentiary rulings below for prejudicial abuse of the trial court's discretion. *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). A trial court abuses its discretion by ruling in a way clearly against the logic and effect of the facts and circumstances before it, or by misinterpreting the law. *Id.* In reviewing whether an abuse of discretion was prejudicial, we assess the probable impact of the improperly admitted evidence on the jury in light of the properly admitted evidence. *Id.* If the conviction is supported by independent, properly admitted evidence of guilt such that there is little likelihood the improperly admitted evidence contributed to the verdict, the error is harmless. *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014).

### A. Admission of the Nurse's Testimony Was Harmless Error

[42] On the second day of trial, March 8, 2016, a nurse who treated A.G. at the children's hospital testified to what the hospital's on-staff social worker told her on October 1, 2015, as follows: "I believe that [A.G.] told the social worker that [Perryman] had hit him with a closed fist." Tr. p. 393. Perryman challenges this statement as hearsay within hearsay (A.G.'s statement to the social worker within the social worker's statement to the nurse) not within an exception. *See*

Ind. Evidence Rules 802 (hearsay not admissible), 803-04 (exceptions), 805 (each part of hearsay-within-hearsay statement must be separately admissible).

[43] The trial court ruled, and the State argues on appeal, that the nurse's testimony was admissible under the exception for statements seeking medical diagnosis or treatment. Evid. R. 803(4). Assuming without deciding this to be correct with respect to A.G.'s statement to the social worker, it cannot be correct with respect to the social worker's statement to the nurse, insofar as the exception requires that the statement be made "by a person seeking medical diagnosis or treatment[.]" *Id.* 803(4)(A). The State does not and cannot allege that the *social worker* sought diagnosis or treatment from the nurse, and does not advance another hearsay exception under which the social worker's statement to the nurse might have been admissible.

[44] Though admission of the nurse's testimony was error, such error was harmless, in light of the independent, properly admitted direct and circumstantial evidence supporting Perryman's conviction, as discussed in Part III *infra*. Specifically, the substance of A.G.'s statement to the social worker was simply cumulative of his more detailed C.A.C. interview. Examined for its value in corroborating the C.A.C. interview, the probable impact of A.G.'s statement to the social worker was minimal. The C.A.C. interview was given within twenty-four hours of A.G.'s statement to the social worker, and there was no evidence suggesting that motive or opportunity for manipulation or fabrication arose during that period.

The trial court's error in admitting A.G.'s statement to the social worker was harmless.

### B.    Admission of the Forensic Biologist's Evidence, If Error, Was Harmless

On the second day of trial, May 8, 2016, a forensic biologist of the Indiana State Police Laboratory testified to her serological analysis of some of the clothes A.G. and Perryman were wearing on September 30, 2015, as well as of the washcloth Schooner saw Perryman holding to A.G.'s face when she arrived home early the next morning. The trial court also admitted the biologist's report concluding that the clothes carried A.G.'s blood and Perryman's DNA. Perryman challenges the admission of this evidence on the ground that the State failed to show the "stringent chain of custody [required] for serological evidence . . . ." *Culver v. State*, 727 N.E.2d 1062, 1068 (Ind. 2000).

Assuming without deciding that Perryman is correct, such error was harmless. The forensic biologist's evidence showed only that A.G. had been bleeding, that some of A.G.'s blood had stained Perryman's clothing, and that Perryman's skin cells were present on A.G.'s clothes in sufficient concentrations to present a testable sample. It was obviously uncontested that A.G. had been bleeding. It was similarly uncontested that Perryman had been with A.G. just after A.G. was injured: Schooler testified to seeing Perryman holding a washcloth to A.G.'s face when she came home from work very early in the morning of October 1, 2015, and Perryman never tried to show otherwise. Finally, that Perryman's skin cells were sufficiently concentrated on A.G.'s clothing made his identity as A.G.'s batterer neither more nor less likely in context; it was ust

as likely a simple consequence of their living together. *See* Tr. p. 462 (cross-examination of forensic biologist).

[48] At closing argument, the State did not have much to say about the serological evidence: "[W]e learned from [it] that [A.G.]'s blood was on [Perryman]'s clothing. And, yes, we would expect it to be there. He was in contact with the boy that night. But it's not on anybody else's clothing . . . ." Tr. p. 498. It is true that A.G.'s blood was not found on anybody else's clothing, but there was no reason to expect the contrary. For Perryman's closing argument, defense counsel argued, "I thought the DNA was just really kind of throw away. . . . [It] proves nothing." Tr. pp. 504-05. We agree.

[49] In itself and in light of the properly admitted, independent evidence of guilt, *see* Part III *infra*, the probable impact of the serology evidence on the jury was minimal, and its admission, if error, was harmless.

### C.  Admission of the Jailer's Evidence Was Not Error

[50] During trial Perryman was seen taking notes with his left hand. On the second day of trial, May 8, 2016, the State called a late-disclosed witness, one of Perryman's jailers at the Boone County jail, and offered a late-disclosed exhibit, Perryman's booking records at the jail, both showing that Perryman was right-handed. Perryman challenges the trial court's admission of this late-disclosed evidence.

[51] "[E]vidence revealed at the time it is sought to be introduced will be excluded if there is evidence of bad faith [on the part of the proponent] or substantial

prejudice [to the opponent]." *Cook v. State*, 675 N.E.2d 687, 691 (Ind. 1996). Continuance, rather than exclusion, is usually the appropriate remedy. *Id.* at 690; *Barber v. State*, 911 N.E.2d 641, 646 (Ind. Ct. App. 2009) (discretion to exclude "limited to instances" of bad faith or substantial prejudice). Five factors guide the trial court's choice of remedy: when the parties first knew of the evidence; the importance of the evidence; the prejudice resulting to the opposing party; the appropriateness of a less severe remedy such as continuance; and whether the opposing party would be unduly surprised and prejudiced by admission. *Vasquez v. State*, 868 N.E.2d 473, 476 (Ind. 2007).

[52] There is no evidence of bad faith on the State's part, and the prejudice to Perryman due to lateness was not substantial. It is true that the State could have earlier anticipated the desirability of proving Perryman to be right-handed, given the configuration of A.G.'s injuries. However, while the State's sense of urgency after seeing Perryman take notes with his left hand on the first day of trial may suggest less than perfect trial preparation, it does not suggest bad faith. Indeed, the need to call the jailer to establish that Perryman is right-handed was not to be expected until Perryman used the subterfuge of appearing to be left-handed in the courtroom.

[53] Moreover, Perryman cannot have been unduly surprised by the late disclosure of evidence elicited by his *own* considered attempt to mislead the jury. If that was not what Perryman intended to do, in so far as the State had not yet finished presenting its case in chief, continuance would have been entirely appropriate to allow Perryman to call witnesses or offer other evidence showing

his left-handedness. However, this is not what Perryman sought to do — presumably because he is not actually left-handed. Neither below nor on appeal has Perryman pointed to any benefit of cross-examination or rebuttal evidence he would have enjoyed but for the State's lateness.

[54] The trial court did not abuse its discretion by failing to exclude the State's late-disclosed evidence.

### III. Sufficient Evidence Supported Perryman's Convictions

[55] Perryman challenges the sufficiency of the evidence supporting his convictions for both battery and neglect. The State was required to prove each element of the offenses charged beyond a reasonable doubt. *Powers v. State*, 540 N.E.2d 1225, 1227 (Ind. 1989). When reviewing whether the State presented sufficient evidence to meet this burden, we consider only the probative evidence and reasonable inferences from it supporting the judgment. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We neither weigh the evidence nor assess witness credibility. *Id.* We affirm if a reasonable jury could have found the defendant guilty beyond a reasonable doubt, *id.* at 147 n. 4, or, put differently, if an inference may reasonably be drawn from the evidence to support the judgment. *Id.* at 147.

*A. Battery*

[56] To prove Perryman guilty of battery as charged, the State was required to prove that Perryman touched A.G. in a rude, angry, or offensive manner, causing A.G. serious bodily injury, while Perryman was at least eighteen years of age

and A.G. was younger than fourteen. I.C. § 35-42-2-1(j). None of these elements were disputed save the identity of A.G.'s batterer. Though A.G. at first said his injuries were self-inflicted, Perryman joined the State in rejecting this theory at trial. Tr. pp. 245 (opening) ("[T]here is no one, no one, no one that believes [it] to be the case [that A.G. hit himself].") 501 (closing) ("No one, no one, no one believes that [A.G.] did this to himself.").

[57] The direct and circumstantial evidence against Perryman permitted a reasonable jury to find him guilty beyond a reasonable doubt of battering A.G. A.G.'s C.A.C. interview directly inculpated Perryman. If believed by the jury, his statements there were in themselves sufficient to sustain the guilty verdict. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012) (uncorroborated testimony of victim sufficient evidence). In addition to this direct evidence, the jury had before it the following circumstantial evidence, from which inferences of guilt could reasonably be drawn in context: Perryman's exclusive access to A.G. on the evening in question; Perryman's concealment of A.G. upstairs from Barnes; the bruise on A.G.'s right shoulder and the injuries to the left side of A.G.'s face, suggesting a right-handed assailant of sufficient strength to hold A.G. down by the shoulder with his left hand while striking "multiple blows" with his right, Tr. p. 406; Perryman's right-handedness; Perryman's insistence on not taking A.G. to the hospital; Perryman's refusal to let A.G. out of his sight until informed of DCS's impending arrival at the children's hospital; and Perryman's flight from the hospital once so informed.

[58] The evidence was sufficient to permit a reasonable jury to find Perryman guilty of battery as charged beyond a reasonable doubt.

### B. Neglect

[59] To prove Perryman guilty of neglect as charged, the State was required to prove that Perryman, having voluntarily assumed the care of A.G., knowingly or intentionally put A.G. in a situation that endangered his life or health. I.C. § 35-46-1-4(a)(1). The *mens rea* is the defendant's "subjective[] aware[ness] of a high probability that he placed the dependent in a dangerous situation." *Gross v. State*, 817 N.E.2d 306, 308 (Ind. Ct. App. 2004). The danger to the dependent must be "actual and appreciable." *Id.* at 309. Here, the State's charge was that Perryman endangered A.G. by "fail[ing] to obtain medical attention for his injuries and/or attempt[ing] to prevent A.G. from obtaining medical attention for his injuries."[4] Appellant's App. p. 14.

[60] Perryman argues the State failed to present sufficient evidence to prove the *mens rea* beyond a reasonable doubt, pointing us to *Taylor v. State*, 28 N.E.3d 304 (Ind. Ct. App. 2015), *trans. denied*. There, we reversed Taylor's conviction for neglect of her infant son for insufficient evidence. *Id.* at 305. While Taylor was at work, her live-in boyfriend beat the infant repeatedly, causing fatal injuries. *Id.* Taylor, ignorant of what her boyfriend had done, came home late in the

---

[4] The neglect statute also criminalizes "depriv[ing] the dependent of necessary support[,]" I.C. § 35-46-1-4(a)(3), which includes deprivation of "medical care." I.C. § 35-46-1-1 (defining "support"). However, both the State's charging instrument and the trial court's final jury instructions referred only to endangerment under Subsection (a)(1). Appellant's App. p. 14 (amended information), Tr. p. 510 (jury instruction).

evening and went to bed after only glancing into her son's bedroom to check on him. *Id.* Around noon the next day, Taylor found the infant dead in his bedroom. *Id.*

[61] The State obtained Taylor's conviction on the theory that she knowingly withheld medical care from her son. *Id.* at 308. We reversed:

> [T]he jury simply was not provided evidence that Taylor inflicted an injury, was present when injury was inflicted, heard the infliction of injury, or saw manifestations of an injury necessitating medical care. . . . The inference-stacking [required to find the *mens rea*] without establishment of a predicate fact . . . is not constitutionally adequate [proof beyond a reasonable doubt].

*Id.* at 309.

[62] *Taylor* is of no help to Perryman. Unlike the evidence there, as discussed in Part III.A *supra*, the evidence here permitted the jury to find that Perryman "inflicted an injury, was present when injury was inflicted, [and] heard the infliction of injury[.]" *Id.* at 308. Perryman argues that A.G.'s injuries were not really "manifest[]" until the next day, *id.*, and, relying on a doctor's trial testimony, that the two-centimeter cut on A.B.'s mouth did not "necessitat[e] medical care" because such injuries cannot be sutured. *Id.* The first point is belied by Schooler's horrified reaction at the sight of her son on the evening in question, and by Perryman's own statements to the effect that A.G.'s injuries looked worse than they were. The second point misses a very large forest for a very

small tree, and is belied by Perryman's feigned "treatment" of A.G. by holding a washcloth to his face.

[63] As discussed in Part III.A *supra*, a reasonable jury could have found that Perryman, a full-grown adult, held down an eight-year-old boy and struck him repeatedly in the face with his closed fist. The child suffered "blunt force trauma," Tr. p. 406, and "significant" pain as a result. Tr. p. 415. Schooler was horrified at A.G.'s appearance when she came home from work; Perryman tried to convince her that things looked worse than they were. A reasonable jury could have concluded that Perryman was lying; that Perryman, having caused the child's injuries, knew their nature and probable extent; that Perryman was subjectively aware of the actual and appreciable danger posed to A.G. should the trauma Perryman inflicted go untreated; and that Perryman repeatedly, and for a time successfully, nevertheless tried to dissuade Schooler from seeking treatment for A.G. No inference-stacking was necessary; the conclusions followed directly from the established predicate fact.

[64] The evidence was sufficient to permit a reasonable jury to find Perryman guilty of neglect as charged beyond a reasonable doubt.

## IV. Denial of Motion for Mistrial Was Not Error

[65] On the second day of trial, March 8, 2016, the jury found Perryman guilty as charged of battery and neglect. On the third day of trial, March 9, 2016, the jury returned to try the habitual offender charge. Before the jury was seated, Perryman unsuccessfully moved for a mistrial on the grounds that, earlier that

morning, he had been put in sight of one to three jurors while standing handcuffed in the breezeway of the courthouse. Perryman appeals the denial of his motion.

[66] The denial of a mistrial lies within the sound discretion of the trial court and is reviewed for abuse of that discretion. *Davis v. State*, 770 N.E.2d 319, 325 (Ind. 2002). Generally, the jury may not see the defendant shackled. *Id.* The general rule is an ancient bulwark of the presumption of innocence. *Stephenson v. State*, 864 N.E.2d 1022, 1029 (Ind. 2007) (citing *Deck v. Missouri*, 544 U.S. 622, 626– 27, 630 (2005)). Unlike a defendant who was tried in shackles, where harm and prejudice are presumed, *id.*, a defendant who was merely seen shackled while being transported must show actual harm to prevail on appeal from denial of a mistrial. *Davis*, 770 N.E.2d at 325 (citing *Jenkins v. State*, 492 N.E.2d 666, 669 (Ind. 1986)).

[67] Perryman cannot show an abuse of discretion here because he did not show actual harm. First, Perryman did not show that any juror actually *saw* him in handcuffs; he established only that he was in the presence of one to three jurors while handcuffed. *See Warr v. State*, 877 N.E.2d 817, 822 (Ind. Ct. App. 2007) (no actual harm where appellant could not show jurors actually saw her shackled), *trans. denied*. Second, no juror was found to have been prejudiced by the sight of Perryman in handcuffs. After hearing Perryman's motion for a mistrial outside the presence of the jury, the trial court seated the jury and asked "whether anything ha[d] happened since . . . yesterday . . . that cause[d] anybody any concern about whether they can be fair and impartial in this case."

Tr. p. 533. No juror indicated this was the case. *Id.* Finally, our supreme court has held that "reasonable jurors could expect defendants to be in police custody [and restrained] while in the hallway of the courthouse." *Davis*, 770 N.E.2d at 326 (original alterations omitted) (quoting *Jenkins*, 492 N.E.2d at 669). This applies with particular force to defendants like Perryman, who have already been found guilty as charged at the conclusion of the first phase of a bifurcated trial. Reasonable jurors could expect defendants found guilty of battery and neglect to be in police custody and restrained the next day, without prejudice to future proceedings.

[68] Because Perryman did not show actual harm resulting from the possibility that one to three jurors saw him handcuffed in the breezeway of the courthouse before trying the habitual offender charge, the trial court did not abuse its discretion by denying Perryman's motion for a mistrial.

## Conclusion

[69] The trial court did not err by admitting A.G.'s C.A.C. interview because it was within the trial court's discretion to find the interview reliable under the protected-person statute and because the statute does not violate the Sixth Amendment on its face or as applied to Perryman. Admission of the nurse's hearsay testimony was harmless error. Assuming admission of the forensic biologist's evidence was error, although that error was harmless as well. Admission of the jailer's evidence was not error. Sufficient evidence supported Perryman's convictions for battery and neglect. The trial court did not abuse its discretion in ruling that the possibility that one to three jurors saw Perryman in

handcuffs before the start of habitual offender proceedings did not entitle Perryman to a mistrial. The judgment against Perryman is therefore affirmed.

[70] Affirmed.

Kirsch, J., and Altice, J., concur.